IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VINCENT GINO CHAVEZ,

             Petitioner,

vs.

SULLIVAN,

             Respondent.

No. 2:18-cv-00952-JKS

MEMORANDUM DECISION

Vincent Gino Chavez, a state prisoner proceeding *pro se*, filed a Petition for a Writ of
Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Chavez is in the custody of the
California Department of Corrections and Rehabilitation and incarcerated at California State
Prison, Corcoran. Respondent has answered, and Chavez has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On March 26, 2013, Chavez was charged with the premeditated murder of Sue Saeturn.
The information alleged as a special circumstance that Chavez intentionally killed the victim
while he was an active participant in a criminal street gang and that the murder was carried out to
further the activities of the gang. It was further alleged that Chavez personally used a deadly and
dangerous weapon, had suffered a prior strike conviction, and had served a prior prison term.
Chavez pleaded not guilty, denied the allegations, and proceeded to a jury trial on April 3, 2013.
On direct appeal of his conviction, the California Court of Appeal laid out the following facts
underlying the charges against Chavez and the evidence presented at trial:

A. The Prosecution
    In August 2011, [Chavez] was living in San Jose but had been staying with his
mother, Rebecca Roman, in Redding for about two months. On August 13, 2011,
[Chavez] attended a birthday party at the home of his sister Jolean Roman. [Chavez's]

sister lived with her longtime boyfriend at a home on Howard Street in Anderson. [Chavez's] mother drove [Chavez], his "uncle" Francisco Rubalcava, and his uncle's girlfriend to the party.[FN4]  Prior to the party, [Chavez] texted his uncle and told him to "[w]ear red."  [Chavez] wore a red hat, red shirt, and jeans to the party.  [Chavez's] uncle wore a black shirt, black shorts, red shoes, and a red belt.  He also died his facial hair red and had a red bandana in his back pocket.

> FN4.  [Chavez] and Rubalcava are not related by blood.  [Chavez's] mother has two children (other than [Chavez] & his sister Jolean) with Rubalcava's brother, and Rubalcava has known [Chavez] for 15 years.  For ease of discussion, we refer to Rubalcava as [Chavez's] uncle herein.

That same night, Kaochanh (Joe) Saetern, his cousin Sue Saeturn, Jim Saefong, and Sou Orn Sachao attended a birthday party at the Anderson Community Center, across the street from [Chavez's] sister's house.  They left the party around 11:45 p.m., after helping to clean up, and headed to Joe's truck, which was parked near [Chavez's] sister's house.

Around that same time, [Chavez's] sister left her party with Anna Webb and two others to pick up a friend.  While they were stopped at a stop sign in front of [Chavez's] sister's house, they saw [Chavez's] sister's dog run across the street and begin barking at Joe, Sue, Jim, and Sou as they were crossing the street on their way to Joe's truck. [Chavez's] sister, who was extremely intoxicated, thought she saw one of the men kick her dog, jumped out of the car, and began yelling and cussing at them.[FN5]  The men yelled back at her, telling her they did not kick her dog.  Anna followed [Chavez's] sister, retrieved the dog, and unsuccessfully attempted to get [Chavez's] sister back in the car. [Chavez's] mother, who was standing on the front step of [Chavez's] sister's (her daughter's) house directed [Chavez] to go and get her.

> FN5.  Anna testified that the men were attempting to shoo the dog away; she did not see the dog being kicked.  Jim testified that the "dog was never touched."  [Chavez's] sister testified that she saw one of "them" kick her dog.  [Chavez's] mother testified that she saw the dog "fly up in the air."

[Chavez] and a few other men from the party approached [Chavez's] sister and the four men.  [Chavez] told his sister to "shut up" and "back off."  A member of [Chavez's] group asked the four men what was going on, and the four men explained that [Chavez's] sister thought that they were trying to hurt the dog, but they were not.  The men exchanged pleasantries and shook hands, and the four men got into Joe's truck and prepared to leave.

After the four men were buckled up and ready to go, they heard a loud noise and one of the truck's passenger-side windows shattered.  [Chavez's] sister had struck the window with her keys, causing it to shatter.  Sue immediately got out of the truck, followed by Joe, and then Jim and Sou.  It was undisputed that a fight ensued and that

Sue was stabbed by [Chavez] during the fight. Witnesses' versions of the fight itself varied.

Joe, who was seated in the driver's seat of the truck, testified that he immediately got out and began yelling and screaming at the group of party goers. He said, "What the hell? Why are you guys doing this? What do you guys want to do?" He was confused because he and his friends had just shaken hands with the people from the party. He walked toward the tailgate of his truck and saw Sue standing there. Sue said he could not breathe very well. Joe walked from the driver's side to the passenger's side of the truck, still looking at the group of partygoers. Once he got to the sidewalk, he saw Sue lying on the ground. He did not see anyone confront Sue or anyone near his truck. His initial thought was that Sue had been shot when the window shattered. As he got out his phone to call 911, he saw people from the party coming towards them. He then heard a few people say, "He's on the phone. Get him." At that point, he ran back to the community center to find help.

Jim, who was seated in the backseat of the truck, testified that he got out of the truck a few seconds after Joe and Sue, and as soon as he did so, he observed a "tussle" about 10 feet behind the truck involving Sue and "like three other people," including [Chavez] and [Chavez's] sister. They were "swinging and fighting." By the time Jim reached the back of the truck, Sue was coming toward him. Sue told Jim that he could not breathe. Jim walked Sue back to the passenger side of the truck. Sue told him that he was bleeding and then collapsed next to the passenger-side door. At that point, many of the people from the party who had been involved in the fight fled, including [Chavez]. Moments later, another group of about 7 to 10 people from [Chavez's] sister's party attacked Jim and Sue. They kicked Sue in the chest and head while he lay on the ground unconscious. The attack lasted about a minute, until Jim recognized one of the attackers and said his name. Police officers arrived a few minutes later.

Sou testified that as soon as he got out of the car, [Chavez's] sister attacked him and knocked his cell phone out of his hand. Sou looked around and saw that Sue had been stabbed and that there was blood all over his clothes. Frightened, he ran back to the community center to get help. He did not see who stabbed Sue.

Anna testified that the truck's driver, Joe, yelled, "You broke my fucking window." She did not hear any of the other occupants say anything. When she saw the passenger door open and one of the occupants step out, she went to retrieve [Chavez's] sister. When she got to the back of the truck, she was knocked down. She did not see who knocked her down. When she set her hand down to get up, she got blood on it, and then smeared the blood in her hair. When she got up, she ran back to [Chavez's] sister's house to clean up.

[Chavez's] sister testified that she was intoxicated on the night in question and could not recall certain events. She did recall that after she broke the window the four men got out of the truck and a fight ensued. The victim, Sue, attempted to punch her but missed. She then saw Anna fall to the ground but did not see how she fell. As Anna fell, [Chavez] stepped in front of his sister and fought with Sue. Sue then fell to the ground. Thereafter, [Chavez] whispered to his sister, "I did it for you." As [Chavez's] sister was

3

attempting to leave the scene, one of the four men grabbed her arm, and she turned and knocked the phone out of his hand.

[Chavez] did not make any gang-related statements or flash any gang signs during the fight.

[Chavez's] mother ran to her car when she saw people running toward the truck after the window had been shattered. As she pulled up to the stop sign in front of [Chavez's] sister's house, she saw "one of the Asians" hit Anna. [Chavez] got into the car. He had blood on his hands and told his mother, "I got him. I got him twice." He got out of the car briefly to retrieve his knife, and when he returned they drove off.

Police officers arrived around midnight and described the scene as chaotic. People were in the intersection screaming, others were attempting to leave, while others retreated into [Chavez's] sister's house. A police officer administered cardio-pulmonary resuscitation (CPR) to Sue until emergency medical technicians arrived, but Sue died within minutes. The cause of death was a stab wound to the heart. [Chavez's] red hat was found next to Sue's body.

[Chavez's] uncle was in the backyard when his girlfriend advised him that something was happening in front of the house. As he walked out the front door, he saw [Chavez] get inside [Chavez's] mother's car and the car drive off. People were running toward [Chavez's] sister's house, and he and his girlfriend "walked in with everybody else." Defendant sent a text to his uncle's phone, reading: "Make sure you let them fools know I was never there."[FN6] A text was later sent from [Chavez's] uncle's phone to [Chavez] stating: "We can't leave cuz the cops have the place surrounded." Later, another text was sent from [Chavez's] uncle's phone to [Chavez], stating: "And your hat, nigga, you got them outtie."[FN7]

FN6.    [Chavez's] uncle denied receiving the text.

FN7.    [Chavez's] uncle acknowledged that he may have sent the text regarding the house being surrounded by the police but denied sending the text regarding the hat.

[Chavez's] mother drove [Chavez] to the home of Donica and John Wilson so that he could wash the blood off his hands. They were there for 10 or 15 minutes. Before leaving, [Chavez] told Donica that he had been in a car accident, and that the blood was from broken glass. Donica said that she understood. [Chavez] then asked, "Do you really understand," and Donica responded, "Yes, I do." Sometime thereafter, [Chavez's] mother told Donica that [Chavez] would kill Donica's whole family if she told the police what she had seen.[FN8] [Chavez] disposed of the knife later that day.[FN9]

FN8.    At trial, [Chavez's] mother acknowledged threatening Donica and telling her that she should keep her mouth shut about what she saw and that she did not want to deal with [Chavez]. She denied telling Donica that [Chavez] would kill her family.

4

FN9.	[Chavez's] mother pleaded guilty to dissuading a witness by force or threat and influencing testimony by a bribe in connection with this case and admitted that those crimes were committed for the benefit of, in association with, or at the direction of a criminal street gang.  She agreed to assist in the underlying investigation in exchange for no prison time and so she "wouldn't lose [her] girls."

[Chavez's] uncle testified that later that same day he asked [Chavez], "What happened," and [Chavez] responded, "I did what I had to do."  [Chavez] also told his uncle that he had "gotten rid of" his knife by throwing it over a bridge.  Later that same day, [Chavez] accompanied his uncle to a friend's house where [Chavez] burned the clothes he had worn to the party.[FN10]

FN10.	[Chavez's] uncle pleaded guilty to accessory after the fact based on his actions after the stabbing.  He agreed to cooperate and give full and truthful testimony in this case in exchange for no prison time.

After the incident, [Chavez] told his sister that people who talk to the police get "dealt with" by being beaten or killed.  He also told her to "stay loyal" to him.[FN11]

FN11.	[Chavez's] sister pleaded guilty to second degree commercial burglary and unauthorized possession of food stamps in connection with another matter.  As part of plea deal, she agreed to testify truthfully at the trial in this case in exchange for a reduction and dismissal of those convictions.

In addition to testifying about the events on the night in question and immediately thereafter, [Chavez's] uncle testified about his relationship with the Norteños, and the Norteño gang in general.  He, like [Chavez], grew up in San Jose.  There were Norteños "all around" his neighborhood, however, he denied being a member of the gang or "functioning" as a member in San Jose, stating, "I was raised in the neighborhood, but I was never what they call flamed up, wearing red, banging."  He explained that he was forced to "choose sides" when he went to jail at the age of 22, and he chose "the Northern side," which meant he was a "Northerner" not a Norteño.  He never put in the work that was required to become a Norteño, such as eliminating sex offenders or snitches.  When he entered jail, he was screened by the gang before they would permit him to associate with them.  He was never fully cleared because he had been convicted of having sex with a minor, a crime that is frowned upon by the gang.  He was "faking" being a Norteño when he went to the party with [Chavez] and falsely represented to [Chavez] that he was a Norteño.

[Chavez's] uncle also testified that red is the primary color of the Norteño gang, and that members often use monikers, or nicknames.  [Chavez's] moniker was "Monster."  Norteños use the number 14 because it stands for the letter "N."  He has various tattoos on his body, which he testified showed his affiliation with Northerners, not Norteños.  Those tattoos include: red colored webbing, "408," a picture of the State

of California with a red star representing San Jose, two sharks with the letters "SJ" in their mouths, and a Huelga bird above the word "San Jose." [Chavez] told him that he was an active member of Norte San Jose, a subset of the Norteños.

On August 14, 2011, the day after the party, [Chavez] told his then girlfriend that he had "killed someone" during a confrontation over someone kicking his sister's dog. He explained that "he grabbed [the victim's] shirt and then ... stabbed him in the chest a few times." He also told her that that the victim never touched or threatened him, and that he did not intend to kill him. He said that if she told anyone what he had told her that "it would ... be all bad" for her.[FN12]

> FN12. [Chavez's] then girlfriend agreed to testify against [Chavez] at trial as part of a negotiated plea deal in another case. In exchange for her truthful testimony, she was allowed to plead guilty to attempted robbery and assault with a deadly weapon with no prison time.

[Chavez's] uncle and his then girlfriend testified that [Chavez] usually carried a pocket knife in his back pocket.

Michael Whittington, a former gang detective and gang intelligence officer with the San Jose Police Department, testified for the prosecution as an expert on gangs. He gained his expertise from "the area surrounding San Jose, Santa Clara County." He testified that the Norteño gang is the predominant gang in San Jose, and that the majority of his hundreds of gang contacts were with Norteño members. There are at least 30 active subsets of the Norteños in San Jose. Norteños are aligned with the prison gang Nuestra Familia. Norteños are "foot soldiers" who "are on the streets selling the drugs, [and] doing the crimes for the purposes of sending money and proceeds up to the Nuestra Familia."

Whittington explained that violence is a part of gang life, and that it "is done in order to enact fear in the community, [and] fear in rivals for the purposes of gaining territory and control." It is common for gang members to carry weapons. "Weapons are tools of the trade" and "benefit the gang because the gang needs to be able to fight at a moment's notice; therefore, weapons will traditionally be found in or around gang members." In gang culture, respect is synonymous with fear. Someone who disrespects a gang member will be assaulted.

Whittington testified that Norteños claim the color red and dress in the colors red, black, and white. Tattoos are used to instill fear and show allegiance. The number "14" represents the letter "N," which is the 14th letter of the alphabet, and stands for Norteños. "408" is the area code for San Jose and shows allegiance to that area or the area the gang claims; it is used by Norteños and Sureños. The same is true of symbols associated with sharks. Other symbols associated exclusively with Norteños include the roman numeral XIV, the Huelga bird, and a combination of five dots—one dot on one side and four on the other representing the number 14.

The prosecution solicited testimony from Whittington and presented documentary evidence regarding three "predicate offenses" involving Norteño gang members in Santa Clara County. The first was an assault that occurred on July 25, 2011. A Norteño and a

Crip, who wanted to become a Norteño, confronted a 13–year–old boy who was wearing a red belt at a park on the south side of San Jose and asked the boy, "Do you bang?" When the boy responded, "I'm nothing," the two men beat and stabbed him. The men were convicted of attempted murder with a gang enhancement. The second crime was an assault that occurred on May 11, 2011. A Norteño gang member riding in his family van along with his wife and four children saw a Sureño he recognized from juvenile hall in the car next to his, got out of his van, and began stabbing the Sureño in the chest. The Norteño was convicted of attempted murder. The third crime was a robbery committed by [Chavez], a Norteño, in San Jose on November 6, 2010. [Chavez] was convicted of robbery, but the crime was not considered gang related.

Whittington also testified that [Chavez] associated with Norteños in jail. [Chavez] had various gang-related tattoos, including: the word "Norte" on his chest; a shark fin coming out of the water at the base of his left bicep; the number "408" on his left arm; the phrase "San Jo" across his back; one dot on one side of his hand and four dots on the other side; the Huelga bird on his left hand; a "B" in the same form as the Boston Red Sox on his right hand, which is specific to the Norteño subset Barrio East Side; the letters "S" and "J" and a shark fin; and a red "14" on his legs. He also wrote several gang-related pieces of graffiti.

Whittington opined that [Chavez] is a Norteño gang member based on his tattoos, his writings, his prior conviction, and his actions on the night in question. In responding to a hypothetical based on some, but not all, of the circumstances of this case, Whittington opined that such a crime would have been committed for the benefit of and in association with the Norteño criminal street gang. He based his opinion on "the prearrangement, the documentation, the tattoos, those elements prior to the assault and then those actions after the assault."[FN13] More particularly, he noted that by wearing red and showing visible tattoos, the two Norteños were "demonstrat[ing] their allegiance out in the open" and "showing their strength in numbers." He also observed that gang members are obligated to retaliate with violence when a family member is disrespected; thus, the first Norteño's violent response to the disrespect shown to his family member was required by the gang. With respect to the Norteño who remained at the party, Whittington observed, "Norteño's come together for the purposes of assisting and associating with themselves to protect themselves to further their criminal activity; therefore, Norteños acting in concert after the crime . . . occurs quite frequently." The additional circumstance that no gang signs were thrown or gang slurs made did not change Whittington's opinion.

> FN13. The hypothetical posed was as follows: "Two documented gang members who are Norteños go to a party. They pre-arrange to wear red. They both have visible Norteño tattoos. [¶] At some point in the party a person disrespects one of the Norteño[s'] family members. This Norteño's whole family was present. This Norteño walks up and stabs the victim dead through the heart. The Norteño flees the scene, forgetting his red hat and his knife. [¶] Within minutes of leaving the scene, the Norteño texts back to the remaining Norteño, instructing him to keep the party quiet. The

remaining Norteño assists the stabbing Norteño by alerting him to forgetting evidence. The stabbing Norteño later provides his clothing and they both destroy the clothing. The witnesses in the case claim they are terrified of the stabber, who is a Norteño."

Whittington acknowledged that a gang member can commit a crime that is not gang related, and pointed to the robbery committed by [Chavez] as an example of such a crime, reasoning that [Chavez] "acted alone, nothing was shouted. There was no other evidence of anything besides a robbery."

Robert Marquez, a veteran gang investigator who had been assigned to the Redding Police Department, also testified as a gang expert for the prosecution. He had spoken to over 1,000 gang members about their tattoos, the structure and methodologies of the gang, and their involvement with and status within the gang. He testified about the structure of the gang and its origins. The first prison gang was the Mexican Mafia. Its purpose was to protect all Hispanics. It eventually splintered into two groups, one of which was Our Family, which became Nuestra Familia or "NF." The Nuestra Familia commissioned the Northern Structure prison gang. In the late 1970's and early 1980's there became a "huge distinction" between north and south, and "what we call Sureños and Norteños." He explained that "there has been a migration of southern Hispanic street gangs moving north, but we have not seen Norteños going south." In 2010 and 2011, the Nuestra Familia was attempting to establish a "street regiment" in Shasta County. Marquez had spoken directly with Norteños who were trying to gain a foothold in Shasta County, and by August 14, 2011, law enforcement had identified at least 20 Norteños who were trying to establish a "street regimen[t]" in Shasta County, members of which had committed a variety of crimes in Shasta County, including assault with a deadly weapon, attempted murder, and murder.

According to Marquez, violence is crucial to the Norteños and all prison and street gangs because it translates into fear, which translates into power. Fear benefits the gang because it helps it control its members, creates a level of notoriety which helps with recruiting new members, and dissuades members of the community from reporting the criminal activities of gang members. Marquez also testified about Norteño clothing, tattoos, colors, and the various ways members are brought into the gang.

Marquez further testified that the primary activities of the Norteños "would be any of the 33 crimes that are outlined in Penal Code [section] 186.22." He testified specifically as to two such crimes. The first occurred in Shasta County in July 2010. A Norteño dressed as a Sureño kidnapped an active Sureño gang member, drove him to the west side of Redding, and "fired a firearm at him attempt[ing] to kill him." The Norteño was convicted of attempted murder and kidnapping. The second incident also took place in Shasta County. In June 2000, a Norteño encountered a Sureño inside a Circle K market, asked the Sureño which gang he belonged to, and when the Sureño did not respond, the Norteño and another man beat the Sureño. The Norteño was convicted of assault with force likely to cause great bodily injury.

Marquez opined that [Chavez] was a Norteño gang member and a Northern Structure prison associate. He based his opinion on two incidents. The first incident

occurred in Corning and involved [Chavez] attacking a rival gang member, while wearing clothing associated with the Norteño street gang, shouting Norteño gang terms, and "throwing" Norteño gang signs. The second incident occurred at the Tehama County Jail and involved [Chavez] assaulting another prisoner. The victim advised jail staff that he believed [Chavez] attacked him on behalf of another Norteño with whom the victim had argued.

The prosecution posed the same hypothetical to Marquez as it posed to Whittington, with the additional fact that the Norteño who stabbed the nongang member arrived at the party armed with a knife. In response to the hypothetical, Marquez opined that such a crime "was a gang-related act that benefits that gang." He testified that the crime was gang related because two gang members agreed to show up to the party dressed in gang colors, and as a general rule gang members arm themselves for their personal protection and for the protection of other gang members. In responding violently to the disrespect shown to his immediate family member, the Norteño acted in accordance with established street gang rules. Had the Norteño failed to respond in that manner, he would have lost stature in the gang and been viewed as weak. The crime benefited the gang because the "sheer ferocity" of the act would encourage fellow gang members to follow orders and instill fear in the community. It would also increase the Norteño's notoriety within the gang, and the gang's stature within the community.

On cross-examination, Marquez acknowledged that it would be "completely out of character" for a Norteño who sees his sister being yelled at and disrespected by a group of people to come up and shake hands with those people. Such behavior would not increase the Norteño's status within the gang. Marquez also acknowledged that it is possible for a gang member to commit a crime not for the benefit of a gang.


B. The Defense

Dr. Rahn Minagawa, a clinical and forensic psychologist, testified for the defense as an expert in gang psychology. Minagawa testified that [Chavez] was a Norteño gang member. He based his opinion on [Chavez's] tattoos, history, and prior interactions with law enforcement. He explained that it was possible for a gang member to engage in criminal activity that was not for the benefit of the gang, such as a response to an attack on a family member. In response to a hypothetical that mirrored the circumstances of this case, Minagawa opined that the gang member coming to the aid of his sister would not be for the benefit of the gang.

[Chavez] did not testify at trial. During closing argument, the defense conceded that [Chavez] is a gang member and that he stabbed Sue. The defense's theory was that the stabbing was the result of a "sudden, rash decision," and thus, [Chavez] lacked the malice aforethought required for murder. The defense argued [Chavez] was guilty of voluntary manslaughter because there was no malice aforethought, and even if there was, he acted in imperfect defense of his sister when he stabbed Sue.


*People v. Chavez*, No. C074316, 2016 WL 3609233, at *1-8 (Cal. Ct. App. Jun. 28, 2016).

At the conclusion of trial, the jury found Chavez guilty of first-degree murder and also found true allegations that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members, and that he personally used a deadly weapon (a knife) in committing the murder. In a bifurcated proceeding, the court found true the allegations that Chavez suffered one prior conviction and had served one prior prison term. The trial court subsequently sentenced Chavez to life imprisonment without the possibility of parole ("LWOP") for the murder, plus a consecutive year for the weapon enhancement.[1] The court stayed imposition of sentence on the remaining enhancements pursuant to California Penal Code § 654.[2]

Through counsel, Chavez appealed his conviction, arguing that: 1) the gang expert's reliance on hearsay evidence violated his constitutional right to confrontation; 2) the trial court improperly admitted gang evidence; 3) the hypothetical questions posed to and answered by one of the prosecution's gang experts resulted in a violation of Chavez's rights; 4) the trial court erred in admitting Chavez's prior robbery conviction as a predicate offense; 5) there was insufficient evidence to support the true findings on the gang enhancement and special circumstance; 6) Chavez received the ineffective assistance of counsel; 7) the trial court should have instructed the jury on voluntary manslaughter based on heat of passion; 8) the cumulative effect of the errors warranted relief; and 9) one of the court's minute orders did not reflect the

---

[1]     The court also imposed a nine-year imprisonment term on another matter.

[2]     Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." CAL. PENAL CODE § 654.

10

oral pronouncement of the court. Respondent agreed that the minute order should be corrected but otherwise opposed the appeal. In a divided opinion, the California Court of Appeal agreed that there was insufficient evidence to support the gang-murder special-circumstance and gang-enhancement findings. *Chavez*, 2016 WL 3609233, at *17-19.[3] The appellate court reversed the judgment as to those true findings, and remanded the case to the trial court for resentencing and correction of the minute order. *Id.* at *22.

After the initial opinion was issued, the California Supreme Court decided *People v. Sanchez*, 374 P.3d 320, 327-28 (Cal. 2016), in which it held that a gang expert may testify about his general knowledge but not about case-specific facts of which he has no personal knowledge. The California Supreme Court determined that such statements violate the Confrontation Clause if the hearsay is testimonial, unless there is a showing of unavailability and the defendant had a prior opportunity for cross-examination or forfeited that right by wrongdoing. *Id.* at 324. On its own motion, the Court of Appeal granted rehearing in light of *Sanchez*. The Court of Appeal issued another divided opinion in which it again reversed the true findings on the gang-murder special circumstance and gang enhancement, but otherwise affirmed the judgment against Chavez. *People v. Chavez*, No. C074316, 2016 WL 5940068, at *21 (Cal. Ct. App. Oct. 13, 2016). Chavez petitioned the California Supreme Court for review of his unsuccessful claims, which was summarily denied on January 11, 2017. His conviction became final on direct review 90 days later, when his time to file a petition for certiorari in the U.S. Supreme Court expired on

---

[3] One member of the three-justice panel disagreed that there was insufficient evidence to support the true findings on the gang-murder special circumstance and gang-enhancement allegations, and would have affirmed the judgment in its entirety. *Chavez*, 2016 WL 3609233, at *22-23 (Mauro, J., dissenting).

April 11, 2017. See *Jiminez v. Quarterman*, 555 U.S. 113, 119 (2009); *Spitsyn v. Moore*, 345 F.3d 796, 798 (9th Cir. 2003).

Chavez then timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on March 31, 2018. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Chavez argues that: 1) the trial court's failure to instruct the jury on voluntary manslaughter based on heat of passion violated his due process rights; 2) the trial court erred in allowing one of the prosecution's gang experts to testify as to a hypothetical with direct reference to Chavez and the incident in question; 3) the trial court erred in allowing the prosecution's experts to relate case-specific testimonial hearsay in explaining the basis of their opinions; and 4) his judgment of conviction must be reversed due to cumulative error.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner

rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.    <u>Instructional Error</u> (Ground 1)

Chavez first argues that the trial court erred in refusing to instruct the jury on the lesser included offense of voluntary manslaughter.  Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding."  *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380 (1990).  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471 U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the

law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id*. Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

Here, Chavez contends that the trial court erroneously rejected his request to instruct the jury pursuant to CALCRIM No. 570, which states that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant acted based on a sudden quarrel or heat of passion. In rejecting the request, the trial court stated that it did not "believe there was any actual provocation or evidence of provocation by the victim toward [Chavez]." After the verdict, Chavez moved for a new trial based in part on the failure to give the instruction, arguing that the evidence presented required it, and again challenged the decision on direct appeal. In rejecting this claim on direct appeal, the Court of Appeal laid out the following guidelines under California law:

A trial court must instruct the jury on all general principles of law relevant to the issues raised by the evidence, including lesser included offenses. (*People v. Moye* (2009) 47 Cal.4th 537, 548 (*Moye*).) Instructions on a lesser included offense must be given when there is substantial evidence from which the jury could conclude the defendant is guilty of the lesser offense, but not the greater. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) The existence of any evidence, no matter how weak, will not justify instruction on a lesser included offense. (*People v. Whalen* (2013) 56 Cal.4th 1, 68.)

We independently review the question of whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Souza* (2012) 54 Cal.4th 90, 113.) When considering whether lesser included offense instructions should have been given, we view the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

Voluntary manslaughter is the intentional but nonmalicious killing of a human being, and is a lesser offense of murder. (§ 192, subd. (a); *Moye*, *supra*, 47 Cal.4th at p. 549.) A killing may be reduced from murder to voluntary manslaughter if it occurs upon a sudden quarrel or in the heat of passion on sufficient provocation, or if the defendant kills in the unreasonable, but good faith, belief that deadly force is necessary in defense of another. (*People v. Beltran* (2013) 56 Cal.4th 935, 942, 951 (*Beltran*); *People v. Manriquez* (2005) 37 Cal.4th 547, 583.)

"Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201.) "''Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation.'''" (*People v. Souza*, *supra*, 54 Cal.4th at p. 116.)

A heat of passion theory of manslaughter thus has both an objective and a subjective component. (*Moye*, *supra*, 47 Cal.4th at p. 549.) "The provocation which incites the defendant to homicidal conduct . . . must be caused by the victim . . . or be conduct reasonably believed by the defendant to have been engaged in by the victim." (*People v. Lee* (1999) 20 Cal.4th 47, 59.) The victim's conduct may have been physical or verbal, but it must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (*Beltran*, *supra*, 56 Cal.4th at p. 939.)

To satisfy the subjective component, the defendant must have killed "while under 'the actual influence of a strong passion' induced by [adequate] provocation." (*Moye*, *supra*, 47 Cal.4th at p. 550.) "''[N]o specific type of provocation [is] required,''" and "the passion aroused need not be anger or rage, but can be any ''''[v]iolent, intense, high-wrought or enthusiastic emotion'''' [citations] other than revenge [citation]." (*People v. Breverman* (1998) 19 Cal.4th 142, 163.)

*Chavez*, 2016 WL 5940068, at *19-20.

The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction. *Beck v. Alabama*, 447 U.S. 625, 638 (1980). The Supreme Court, however, has not decided whether to extend this rationale to non-capital cases. The Ninth Circuit, like several other federal circuits, has declined to extend *Beck* to find constitutional error arising from the failure to instruct on a lesser included offense in a non-capital case. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."); *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976) ("Failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding."). Accordingly, the decision of the California courts denying Chavez relief as to this claim was not contrary to United States Supreme Court authority as set forth in *Beck*.

Nevertheless, the Ninth Circuit has stated, without deciding, that "the refusal by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim" under clearly established United States Supreme Court precedent. *Solis*, 219 F.3d at 929.[4] Contrary to Chavez's argument,

---

[4]    A number of district courts in the Ninth Circuit, including this one, have questioned whether the Ninth Circuit's statement in *Solis* is required by the holdings of clearly-established Supreme Court authority. *See, e.g.*, *Garcia v. Sherman*, No. 14-cv-00980, 2018 WL 347866, at *15 n.1 (E.D. Cal. Jan. 10, 2018) (explaining that subsequent Ninth Circuit cases have cited *Solis* "for the absolute proposition that there is no clearly established federal constitutional right to instructions on lesser-included offenses in non-capital cases); *Chaidez v. Knowles*, 258 F. Supp. 2d 1069, 1096 n.15 (N.D. Cal. 2003) (suggesting that there is no clearly established Supreme Court authority for the *Solis* proposition). As discussed above, however, Chavez does not benefit from the *Solis* proposition in any event.

however, the evidence simply did not support such instruction. In rejecting his claim, the appellate court recounted the following evidence:

> Here, the evidence showed that [Chavez's] sister was intoxicated and hysterical at all relevant times herein. When she initially accused the four men of kicking her dog, [Chavez] intervened and the matter was peacefully resolved. Thereafter, the four men got inside a truck and were preparing to leave, when [Chavez's] sister shattered the truck's window with her keys. At that point, the victim Sue and the other three men got out of the truck. Jim, who had been seated in the backseat of the truck, testified that when he got out, he observed a "tussle" about 10 feet behind the truck involving Sue and "like three other people," including [Chavez and his] sister. They were "swinging and fighting." [Chavez's] sister testified that Sue attempted to punch her but missed. [Chavez] then stepped in front of her and fought with Sue. Sue then fell to the ground. Immediately thereafter, [Chavez] got into a car driven by his mother. Before they drove off, [Chavez] got out of the car and retrieved his knife.

*Id.*

As the Court of Appeal reasonably concluded, even assuming that a jury could find Sue's conduct sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation or reflection, "there is no evidence, direct or circumstantial, that would support an inference that [Chavez] subjectively harbored such strong passion, or acted rashly or impulsively while under its influence" when he stabbed the victim. *Id.* As the Court of Appeal noted:

> To the contrary, what little evidence there is regarding [Chavez's] state of mind suggests that his judgment was not obscured. After stabbing Sue, [Chavez] immediately proceeded to a waiting car, driven by his mother, and before departing, had the presence of mind to get out of the car, return to the scene, and retrieve the murder weapon.

*Id.* Thus, Chavez fails to satisfy the subjective component of a heat of passion theory of manslaughter. Because an instruction on the lesser included offenses was not supported by the evidence, no due process violation arose from the failure to instruct the jury on the lesser included offense. *See Bradley v. Duncan*, 315 F.3d 1091, 1098-1101 (9th Cir. 2002) (finding

federal due process violation where defendant's request for instruction on the only theory of defense was denied); *Solis*, 219 F.3d at 929.

In addition to the possibility of demonstrating a due process violation based on the failure to instruct on a theory of the defense, clearly established federal law provides that, in order to establish a violation of his federal due process rights by the failure to give a requested jury instruction, Chavez must demonstrate that the instruction should have been given, and that its omission "so infected the entire trial that the resulting conviction violates due process." *Henderson*, 431 U.S. at 154; *see Clark v. Brown*, 442 F.3d 708, 726 (9th Cir. 2006) (holding that trial court's failure to give instruction was not harmless because there was a "reasonable probability" that, armed with the omitted instruction, the jury would have concluded that the arson was "incidental" and that the felony-murder special circumstance was not true). Here, Chavez has not carried this heavy burden because, as the Court of Appeal noted, the jury found Chavez guilty of premeditated, deliberate murder under properly given instructions and therefore implicitly rejected any theory that Chavez acted impulsively or without careful consideration. *See Chavez*, 2016 WL 5940068, at *21. It is thus clear that the failure to instruct on voluntary manslaughter could not have had any adverse effect whatsoever on the jury's decision, much less the "substantial and injurious effect" required to show the error was harmful. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Thus, the Appellate Court's alternate conclusion that any error in failing to give a heat of passion instruction was harmless was both reasonable and fully supported by the record. Accordingly, Chavez is not entitled to relief on this instructional error claim.

B.  Erroneous Gang Expert Testimony (Grounds 2, 3)

Chavez next avers that the trial court made two errors with respect to the prosecution's proffered gang testimony.

1.  *Improper hypotheticals* (Ground 2)

Chavez first claims that the trial court improperly allowed the prosecution's gang expert to opine on Chavez's guilt by responding to hypotheticals that mirrored the facts of his case with direct references to Chavez and the incident at issue.  The Court of Appeal laid out the following facts underlying this claim:

> In her case-in-chief, the prosecutor posed a hypothetical to Marquez based on the facts of the charged crime and asked him whether the crime "was committed for the benefit [of] or in association with a criminal street gang?"  Marquez testified that "it is definitely a gang-related offense."  The prosecutor then asked Marquez to explain the basis of his opinion.  Marquez said that his opinion was "based on the totality of the incident.  You have a gang member request that another gang member show up to a party wearing gang colors.  Gang members, as a general rule, arm themselves for their personal protection and for the protection of other gang members.  [¶]  Whether or not the family member was a gang member, for me, is irrelevant, in that the non-gang family member is still related to the gang member.  Family is family and that extends across the gang to the immediate family who may have or may not have gang ties.  [¶]  Again, for, in this case, Chavez, not to respond to defend his sister to avenge this slight or perceived disrespect would be seen as cowardice or weakness on his part.  And again, it would diminish his stature within the gang in front of the other gang member who was there.  And so Chavez had an obligation to act to protect his own reputation within the gang."
>
> The prosecutor then asked Marquez, "How, under that set of facts, do you think it would further promote the gang and the criminal conduct of the gang specifically?"  Marquez explained that "a gang member committing such a vicious act" would gain notoriety for himself and stature for the gang in the community.  Marquez continued, "I can assure you that people in prison have heard about this incident.  They get newspapers and they are allowed to watch TV and they see a newscast, so they have heard about this incident so it has increased the stature of the Norteños in Shasta County."  [Chavez's] trial counsel objected on the grounds the testimony was speculative "as far as who has seen what on what TV."  The trial court overruled the objection and then sought to clarify that Marquez had no personal knowledge that anyone in prison had actually read about the underlying crime in the paper, and Marquez responded, "Not read in the paper, but . . . I have talked to confidential informants who have stated things about Vinny Chavez, Vincent Chavez, in relationship to this homicide."  The prosecutor then asked, "[I]n my

hypothetical there were people around who may or may not have been gang members who watched and knew that Vincent Chavez had killed an innocent man. Would it have needed to have been another gang member who knew or watched this for the gang to have benefited from the act?" Marquez responded in the negative, explaining that anyone who had seen or heard about such an act would fear the perpetrator and that fear would translate into power.

The prosecutor next asked Marquez, "Hypothetically, would a street gang member who went to prison after having viciously stabbed someone through the heart gain additional status in the Norteño gang in custody?" Marquez responded, "It has been my experience that is the case. An individual is going to show up into the in-custody setting in prison, he's going to have to fill out his new arrival questionnaire, talk about the criminal offenses he's committed in custody and out of custody, and individuals that belong to the Norteño gang and the Northern Structure prison gang are going to review that new arrival questionnaire . . . and they are going to know about the ferocity of that crime." Thereafter, the trial court asked Marquez, "[I]n general, is your opinion as to individuals who would commit a crime of murder and then enter the prison, not as to this specific defendant, but this is based on your training and experience from what may occur in a similar situation; is that fair to say?" Marquez responded in the affirmative, explaining that "an individual who commits a murder would have greater status than an individual that sold narcotics or robbed a 7/11." The trial court then admonished the jury "that that part of [Marquez's] answer doesn't apply to [Chavez] in this particular case, that that is something that is going to happen with [Chavez] because that is up to the jury to decide what the outcome is of this particular case. So he's talking in generalities of individuals who would enter prison after having committed a crime that would be gang-related . . . ."

*Chavez*, 2016 WL 5940068, at *12-13.

Chavez argues, as he did on direct appeal, that Marquez improperly offered direct opinions on his guilt and that such testimony should have been excluded. The Court of Appeal rejected the claim as follows:

Here, Marquez properly opined that a homicide committed in the manner described in the hypothetical was gang related. We recognize that some of his responses and one of the prosecutor's questions strayed from the hypothetical and referred directly to [Chavez] and/or the incident in question. Marquez, however, never testified directly that [Chavez] stabbed Sue for a gang purpose or with the intent of promoting, furthering, or assisting the criminal conduct of gang members. In explaining the basis for his opinion that the crime described in the hypothetical was gang related, Marquez stated that he considered it irrelevant that the family member who had been involved in the argument that led to the stabbing was not a gang member because "[f]amily is family and that extends across the gang to the immediate family . . . ." He then applied that general

statement directly to [Chavez], stating in pertinent part, "Chavez ha[d] an obligation to act to protect his own reputation within the gang." When considered in context, it is clear that Marquez was offering an opinion as to the expected response of a gang member under the circumstances of this case. Significantly, he did not testify directly that [Chavez] stabbed Sue to protect his own reputation within the gang, but rather that a gang member in [Chavez's] position would have felt obligated to respond with violence. Marquez's subsequent statement that he had been told that prison inmates knew about [Chavez's] crime as a basis for his opinion that [Chavez's] actions increased the stature of the gang, does not amount to an opinion concerning [Chavez's] subjective intent. In any event, the trial court clarified that Marquez's opinion "as to individuals who would commit a crime of murder and then enter . . . prison" was "not as to this specific defendant" and admonished the jury that Marquez's response did not apply to "the defendant in this particular case." Finally, the prosecutor's direct reference to [Chavez] in the midst of her hypothetical did not turn Marquez's response thereto into improper opinion testimony. The prosecutor observed that "in my hypothetical there were people around who may or may not have been gang members who watched and knew that Vincent Chavez had killed an innocent man. Would it have needed to have been another gang member who knew or watched this for the gang to have benefited from the act?" Marquez responded to the question in hypothetical terms and did not refer directly to [Chavez] but rather to "this individual." Given the context in which the challenged remarks were made, we find that it was sufficiently clear to the jury that Marquez was expressing an opinion on how he would expect a gang member to react under the circumstances described in the hypothetical, not on [Chavez's] subjective intent in this instance.

*Id.* at *14.

Under California law, expert testimony on criminal street gangs is admissible to prove the elements of the criminal street gang substantive offense and the gang enhancement. *See People v. Jasso*, 150 Cal. Rptr. 3d 464, 484 (Cal. Ct. App. 2012) (relying on expert testimony in part to support a conviction for the substantive offense); *see also People v. Hernandez*, 94 P.3d 1080, 1085 (Cal. 2004) ("In order to prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs."). Chavez nonetheless argues that Marquez's testimony was improper because he commented on Chavez's guilt by referring to Chavez directly in response to a hypothetical question. According to Chavez, it was error to admit Marquez's testimony because it invaded the province of the jury

on an ultimate issue in the case—whether the homicide was gang-related and there was no other motive for the killing. Chavez bases this argument on *People v. Vang*, a California Supreme Court decision holding that, while a witness may be asked a hypothetical based on the facts supported by the evidence, the hypothetical cannot ask the witness to opine as to the actions of the specific defendant at trial. 262 P.3d 581, 588 (Cal. 2011) (commenting that expert testimony regarding the specific defendant at issue acted for a gang reason might be objectionable, but declining to address the issue because the expert there did not testify directly about the defendant in that case). However, Chavez's contention is that the testimony violated state law, and federal habeas relief is not available for errors of state law. *Estelle*, 502 U.S. at 67-68.

Chavez additionally argues that the testimony deprived him of due process in violation of federal law. But under federal law, there is no support for "the general proposition that the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact." *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009). "[I]t is 'well-established . . . that expert testimony concerning an ultimate issue is not per se improper.' Although '[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence . . . an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact.'" *Id*. (internal citations omitted); *see also Duvardo v. Giurbino*, 410 F. App'x 69, 70 (9th Cir. 2011) (noting that the Supreme Court "has never held that the admission of expert testimony on an ultimate issue to be resolved by the trier of fact violates the Due Process Clause"); *Briceno v. Scribner*, 555 F.3d 1069, 1077-78 (9th Cir. 2009), *overruled on other grounds as recognized in Emery v. Clark*, 643 F.3d 1210, 1215 (9th Cir. 2011). Indeed, the Ninth Circuit has recently reiterated that "because 'there is no clearly established constitutional

right to be free of an expert opinion on an ultimate issue . . . the admission of the opinion testimony of [a gang expert] cannot be said to be contrary to, or an unreasonable application of, Supreme Court precedent.'" *Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018) (quoting *Briceno*, 555 F.3d at 1077-78).

Moreover, Chavez fails to show that the challenged testimony had a "substantial and injurious effect or influence on" his case. *Brecht*, 507 U.S. at 623. Here, the gang-related testimony would have directly affected only the jury's verdict as to the gang-murder special circumstance and the gang enhancement, but the Court of Appeal reversed the true findings on those allegations on direct appeal. Chavez does not demonstrate that the gang expert opinion testimony had a "substantial and injurious effect or influence" on the jury's first-degree murder conviction, as the Court of Appeal reasonably concluded in rejecting Chavez's related Confrontation Claim, *see infra*. The trial court also instructed the jury that it was not to interpret Marquez's opinions as comments on what Chavez did or why because such questions were squarely within the jury's own province to decide. This Court must assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth). For all these reasons, Chavez is not entitled to relief on this claim.

2.     *Confrontation violation* (Ground 3)

Chavez additionally argues that the admission of hearsay evidence through the testimony of the prosecution's gang experts violated his right to confrontation.  The California Court of Appeal considered and rejected this claim as follows:

> Citing *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), [Chavez] contends that his Sixth Amendment right to confront and cross-examine witnesses was violated when the prosecution's gang experts were allowed to rely on and present large amounts of testimonial hearsay to the jury in explaining their opinions.  We initially rendered a decision in this case on June 28, 2016.  Relying on our Supreme Court's decision in *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), which held that reliable hearsay evidence is admissible under Evidence Code sections 801 and 802 for the nonhearsay purpose of revealing the basis for an expert witness's opinion and in that context is not admitted for the truth, we rejected [Chavez's] claim.  We concluded that because the challenged evidence was admitted for the limited purpose of explaining the basis of the gang experts' opinions and not for its truth, neither the hearsay doctrine nor the confrontation clause were implicated.
>
> Two days after we rendered our decision, our Supreme Court rendered its decision in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), which "clarif[ied] the proper application of Evidence Code sections 801 and 802, relating to the scope of expert testimony," (id. at p. 670) and disapproved of *Gardeley* "to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." (Id. at p. 686, fn. 13.)  The court adopted the following rule: "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay.  Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception."  (*Id.* at p. 684.)
>
> We granted rehearing in light of the court's decision in *Sanchez*, vacated our decision, and directed the parties to submit supplemental letter briefs addressing *Sanchez*'s impact on defendant's arguments.[FN14]  Having reviewed those briefs, we shall conclude that many of the out-of-court statements related by the prosecution's gang experts were not case-specific, and thus, did not constitute inadmissible hearsay under California law.  Assuming for argument's sake that the remaining statements were case-specific and testimonial, and thus, should have been excluded under *Crawford*, we conclude that their admission was harmless beyond a reasonable doubt.
>
>> FN14.  In their supplemental letter brief, the People appear to question whether *Sanchez* "applies retroactively to cases pending on direct appeal."  The People, offer no legal authority that would support a finding that *Sanchez* does not apply, and we are not aware of any such authority.  Rather, "'[a]s a matter of normal judicial operation, even a non-retroactive decision [*i.e.*,

25

one that cannot serve as a basis for collateral attack on a final judgment] ordinarily governs all cases still pending on direct review when the decision is rendered.'" (*People v. Guerra* (1984) 37 Cal.3d 385, 400; *see also In re Richardson* (2011) 196 Cal.App.4th 647, 663.) While we issued our initial decision in this matter two days before the court rendered its decision in *Sanchez*, the remitittur had not yet issued. Moreover, we have since vacated that decision and granted rehearing in this case. Thus, the case is pending on direct review and is governed by *Sanchez*.

"The admission of expert testimony is governed not only by state evidence law, but also by the Sixth Amendment's confrontation clause, which provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .'" (*Sanchez*, 63 Cal.4th at p. 679, quoting U.S. CONST., 6th Amend.). In *Crawford*, the United States Supreme Court held that the admission of testimonial hearsay against a criminal defendant violates the confrontation clause unless the declarant is unavailable to testify, and the defendant had a prior opportunity for cross-examination. (*Crawford*, *supra*, 541 U.S. at p. 59, & fn. 9.) "[A] court addressing the admissibility of out-of-court statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is testimonial hearsay, as the high court defines that term." (*Sanchez*, at p. 680.) Improper admission of hearsay constitutes state law statutory error subject to the harmless error test set forth in *Watson*.[FN15] Improper admission of testimonial hearsay implicates constitutional rights and is therefore subject to the *Chapman*[FN16] test for harmless error. (*Sanchez*, at pp. 698–699.)

FN15. *People v. Watson* (1956) 46 Cal.2d 818.

FN16. *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 205].

"While lay witnesses are allowed to testify only about matters within their personal knowledge (EVID. CODE, § 702, subd. (a)), expert witnesses are given greater latitude . . . . In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc. . . . An expert's testimony as to information generally accepted in the expert's area, or supported by his own experience, may usually be admitted to provide specialized context the jury will need to resolve an issue. When giving such testimony, the expert often relates relevant principles or generalized information rather than reciting specific statements made by others." (*Sanchez*, *supra*, 63 Cal.4th at p. 675.)

"The hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise." (*Sanchez, supra,* 63 Cal.4th at p. 676.) "By contrast, an expert has traditionally been precluded from relating case-specific facts about which the expert has no independent knowledge. Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*) "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Id.* at p. 684, fn. omitted.) *Sanchez* "does not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his expertise." (*Id.* at p. 685.) "Gang experts, like all others, can rely on background information accepted in their field of expertise under the traditional latitude given by the Evidence Code. They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven." (*Ibid.*)

In his supplemental letter brief, [Chavez] asserts that both of the prosecution's gang experts related case-specific testimonial hearsay in explaining the basis for their shared opinion that Norteño members are engaged in a pattern of criminal activity.[FN17] [Chavez] contends that "Whittington's testimony violated *Sanchez* when he testified to the case specific facts underlying each of the predicate offenses that he gathered during an investigation." Whittington testified about two attempted murder convictions suffered by two Norteño gang members, each of which involved a stabbing. Whittington's knowledge of the facts underlying those convictions came from his own investigation. Marquez testified about two convictions—one for attempted murder and kidnapping and the other for assault with force likely to cause great bodily injury—suffered by two Norteño gang members. Marquez testified as an expert witness in the attempted murder and kidnapping case, and was one of the officers who took the defendant in the assault case into custody. Under *Sanchez,* an expert is "precluded from relating case-specific facts about which the expert has no independent knowledge. *Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried.*" (*Sanchez, supra,* 63 Cal.4th at p. 676, italics added.) None of the convictions at issue here involved [Chavez], and none of the facts testified to by Whittington or Marquez related to the events or participants involved in this case. Accordingly, the underlying facts related by the prosecution's experts concerning those convictions are not "case-specific," and thus, their admission did not run afoul of state hearsay rules or the Sixth Amendment.[FN18] (*Sanchez,* at p. 676.) Rather, it is more akin to background information concerning the gang. (*Ibid.*) Moreover, to the extent that Whittington and Marquez's testimony was based on their own personal knowledge and investigation, it was not subject to exclusion on hearsay grounds regardless of whether it was case-specific. (*Ibid.*)

[Chavez] objected to the challenged testimony on hearsay and *Crawford*
grounds. He interposed his objection during the prosecutor's direct
examination of Whittington. The trial court overruled the objection on the
grounds that (1) experts can rely on hearsay, and (2) the testimony was
"not being offered for the truth," but rather "as the basis for his expertise
and opinion." Thereafter, the trial court granted [Chavez's] request for a
standing objection.

FN18. Whittington also testified about a robbery conviction suffered by [Chavez]
to establish that Norteño members engage in a pattern of criminal activity.
[Chavez], however, does not claim that such testimony violated state
hearsay rules or the Sixth Amendment.

[Chavez] also claims that Marquez related case-specific testimonial hearsay to the
jury when he testified about prior gang-related assaults committed by [Chavez] in
explaining the basis of his opinion that [Chavez] is a member of the Norteño street gang,
and that such evidence "could have led . . . the jury to impute the basest motive to [him]
and conclude [he] deserved conviction of the most serious offenses based on his prior
conduct." As we shall explain, any error in admitting this testimony was harmless
beyond a reasonable doubt.

Marquez testified that he based his opinion that [Chavez] is [a] Norteno street
gang member and a Northern Structure prison associate in part on a 2001 conviction in
Tehama County and an incident at the Tehama County Jail. Marquez elaborated: "One
was an incident that happened in Corning where it is documented that [Chavez] attacked
a rival gang member, was wearing Norteño gang clothing, shouted gang terms and threw
gang signs. [¶] The second case that I considered came from the Tehama County Jail.
And in that case it's documented that [Chavez] assaulted another prisoner. The other
prisoner relayed to staff that he believed [Chavez] specifically attacked him on behalf of
another Norteño gang member that the victim had an argument with prior." Marquez
learned of the facts underlying the conviction and the incident at the Tehama County Jail
from a Tehama County probation report. Marquez further testified that he also
considered [Chavez's] "CDC file" in concluding that defendant is a gang member. In
particular, he testified concerning "a rules violation report, CDC 115, where [Chavez]
was found guilty, along with another Northern Hispanic from Santa Clara County, of
assaulting another Northern Hispanic from Stanislaus County."

Assuming for argument's sake that Marquez's testimony concerning these prior
incidents constituted case-specific testimonial hearsay and should have been excluded
under the confrontation clause, its admission was harmless beyond a reasonable doubt
because other witnesses testified, without objection, that [Chavez] admitted engaging in
similar conduct. [Chavez's] sister testified that [Chavez] told her that he had "beaten up"
another gang member whom he said was a "drop out" while defendant was in prison.
[Chavez's] uncle testified that [Chavez] told him that he "beat up" someone who had
snitched on [Chavez] while [Chavez] was in prison. Donica Wilson testified that
[Chavez] told her that he was part of the Norteño street gang and had "beat up" a lot of

people and committed a lot of crimes. Moreover, documentary evidence of [Chavez's] 2001 conviction for assault with a deadly weapon was admitted without objection, and evidence of his 2011 robbery conviction was properly admitted [.][FN19]

> FN19. Records of prior convictions are business records and, therefore, nontestimonial statements. (*People v. Moreno* (2011) 192 Cal.App.4th 692, 710.)

[Chavez] also takes issue with the following out-of-court statements related by Marquez in support of his opinions: [Chavez] is a "squad member" for the Northern Structure prison gang at the Solano prison; [Chavez] goes by the moniker "Monster"; [Chavez] threatened to attack "Southerners" if released in the prison yard; [Chavez] refused to "program" on the "Lassen yard" and was placed in "administrative detention"; [Chavez] has a Huelga Bird tattoo on his hand; [Chavez] is an active Norteño gang member in Redding; and inmates at the Shasta County Jail learned of this incident from reading newspapers. Again, assuming for argument's sake that the challenged testimony constituted case-specific testimonial hearsay, its admission was harmless beyond a reasonable doubt. In section V (infra at p. 35), we reverse the jury's true findings as to the gang enhancement and gang-murder special circumstance. Thus, to the extent the challenged testimony may have influenced the jury's findings as to the gang enhancement and gang-murder special circumstance, any prejudice has been mitigated. To the extent defendant contends that the admission of the out-of-court statements listed above contributed to the jury's first degree murder verdict by leading "the jury to impute the basest motive to [Chavez]," we disagree. While evidence that a defendant is a member of a criminal street gang can be prejudicial, here, the defense conceded that [Chavez] was a Norteño gang member, and even if they had not, the evidence overwhelming established that he was a member. Evidence that [Chavez] was known by the moniker "Monster" and had threatened to attack rival gang members while in prison might also suggest that defendant is a violent individual, however, other evidence showed that he goes by the moniker "Monster" and at least three witnesses testified that defendant told them he had engaged in assaultive conduct while in prison. On the record before us, we conclude beyond a reasonable doubt that [Chavez] would not have been convicted of a lesser offense had Marquez's testimony concerning [Chavez] and his prior bad acts been excluded.

*Chavez*, 2016 WL 5940068, at *8-10.

The Confrontation Clause of the Sixth Amendment mandates that a criminal defendant has the right to confront and cross-examine the witnesses against him. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987). This generally means that out-of-court testimonial statements by a witness are not admissible against a defendant unless the witness is available for

cross-examination at trial or the defendant had an opportunity to cross-examine the witness about the statements before trial. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

As the Court of Appeal noted, shortly after the initial appellate decision in this case was rendered, the California Supreme Court issued *People v. Sanchez*, 374 P.3d 320, 327-28 (Cal. 2016), in which it held that a gang expert may testify about his general knowledge but not about case-specific facts of which he has no personal knowledge. It determined that such statements violate the Confrontation Clause if the hearsay is testimonial, unless there is a showing of unavailability and the defendant had a prior opportunity for cross-examination or forfeited that right by wrongdoing. *Id.* at 334-35 ("In sum, we adopt the following rule: When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay.").

The Court concludes that *Sanchez* does not establish a right to federal habeas relief here. First, the California Supreme Court's determination of federal constitutional law does not constitute "clearly established Federal law, as determined by the Supreme Court of the United States" and is not binding on this Court. *See Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004) ("Although lower federal court and state court precedent may be relevant when that precedent illuminates the application of clearly established federal law as determined by the United States Supreme Court, if it does not do so, it is of no moment."); *Hernandez v. Small*, 282 F.3d 1132, 1140 (9th Cir. 2002) ("[D]ecisions of [the United States Supreme] Court are the only ones that can form the basis justifying habeas relief . . . ."). Moreover, even assuming that *Sanchez* is binding on this Court, as the Court of Appeal reasonably concluded, it is nonetheless distinguishable from the facts of this case because, unlike in *Sanchez*, the vast majority of out-of-

court statements related by the gang experts were not case-specific and, to the extent any were, their admission was harmless beyond a reasonable doubt. *See Chavez*, 2016 WL 5940068, at *8. Indeed, California courts have since interpreted *Sanchez* to bar expert-witness testimony only if it relates "to the particular events and participants alleged to have been involved in the case being tried." *See, e.g.*, *People v. Vega-Robles*, 224 Cal. Rptr. 3d 19, 43 (Cal. Ct. App. Mar. 7, 2017) (no *Sanchez* error in admitting gang-expert testimony about gang's history and founding because it constituted background information and not case-specific facts barred by hearsay rule).

Furthermore, the Federal Rules of Evidence permit an expert to rely on inadmissible hearsay evidence as long as the evidence is of the kind experts in the field regularly consult. FED. R. EVID. 703; *see United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (holding that police officer possessing years of experience and special knowledge of gangs may qualify as expert witnesses); *see also United States v. Steed*, 548 F.3d 961, 976 n.13 (11th Cir. 2008) (noting that there exists no Supreme Court precedent pertaining to expert witness' reliance on otherwise inadmissible sources). Likewise, the Constitution does not prevent an expert from relying on hearsay to form his or her opinion. *See United States v. Beltran–Rios*, 878 F.2d 1208, 1213 (9th Cir. 1989) (stating that where a defendant is given ample opportunity to examine an expert whose opinion is based in part on hearsay, no confrontation clause violation occurs).

Based on the foregoing precedent, numerous federal courts have specifically held since *Crawford* that the introduction of otherwise inadmissible evidence in support of the testimony of a gang expert witness does not violate the Confrontation Clause. *See, e.g.*, *United States v. Palacios*, 677 F.3d 234, 243-44 (4th Cir. 2012); *Mundell v. Dean*, No. CV 11-7367, 2014 WL

7338819, at *6 (C.D. Cal. Dec. 22, 2014) ("[A] gang expert's reliance on hearsay evidence does not violate the Confrontation Clause where the underlying hearsay is not admitted for the truth of the matter asserted, but rather to explain the basis of the gang expert's opinion."); *Alejandre v. Brazelton*, No. C 11–4803, 2013 WL 1729775, at *10-11 (N.D. Cal. April 22, 2013) (expert witness' testimony concerning the meaning of defendant's tattoos based in part on hearsay statements from undisclosed parolees did not violate Confrontation Clause); *Her v. Jacquez*, No. 2:09-cv-612, 2011 WL 1466868, at *33 (E.D.Cal. Apr. 18, 2011) (gang expert's testimony about specific gangs and their activities and membership, based on information imparted to him by others, did not violate Confrontation Clause because underlying information not offered for its truth but merely to support expert's opinion); *Walker v. Clark*, No. CV 08–5587, 2010 WL 1643580, at *15 n. 8 (C.D. Cal. Feb. 18, 2010) (citing cases); *Lopez v. Jacquez*, No. 1:09-cv-1451, 2010 WL 2650695, at *5 (E.D. Cal. July 1, 2010) ("[T]he Court does not find that an objective application of *Crawford* would result in a finding that the gang expert's reliance on hearsay testimony to explain his opinion that Petitioner was a member of the West Fresno Nortenos, and that the West Fresno Nortenos area criminal street gang, to be in violation of Petitioner's Confrontation Clause rights.").

Under these guidelines and existing precedent, the Court cannot find the state courts' rejection of Chavez's confrontation claim unreasonable or contrary to Supreme Court authority. A review of the record indicates that whatever conversations the experts may have had with other persons, the experts did not testify at Chavez's trial as to the truth of the statements made by those persons. Rather, any such statements were used solely to form the basis for the experts' opinions. In this regard, the jury was specifically instructed that hearsay matters relied on by

expert witnesses to form their opinions were not offered for the truth of those matters but were to be considered only in evaluating the basis of the expert's opinions. Further, as experts, under federal law they could properly base their opinion on inadmissible evidence, including hearsay, of a kind that experts in the field regularly consult.

Moreover, even if the statements relied on by the experts in forming their opinion testimony could be considered testimonial in nature, their admission did not implicate Chavez's right to confrontation. As the Fourth Circuit has explained:

> An expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation. Allowing a witness simply to parrot "out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion" would provide an end run around *Crawford*. *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007). For this reason, an expert's use of testimonial hearsay is a matter of degree. *See* Ross Andrew Oliver, Note, *Testimonial Hearsay as the Basis for Expert Opinion: The Intersection of the Confrontation Clause and Federal Rule of Evidence After Crawford v. Washington*, 55 HASTINGS L.J. 1539, 1560 (2004) (describing a "continuum of situations" in which experts rely on testimonial hearsay). The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay. As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no *Crawford* problem. The expert's opinion will be an original product that can be tested through cross-examination.

*United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009); *see also United States v. Law*, 528 F.3d 888, 911-12 (D.C. Cir. 2008) (finding no Confrontation Clause violation based on admission of an expert's testimony because the expert did not simply convey statements by other declarants); *but cf. United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (noting that police expert's testimony explaining inadmissible evidence he relied upon in reaching his conclusion may implicate the Confrontation Clause as the expert simply transmitted hearsay to the jury).

Here, a review of the record indicates that the experts were not merely transmitters of testimonial hearsay. Chavez was given the opportunity to cross-examine the experts regarding opinions as well as the basis thereof, and the jury was able to judge the credibility of the expert testimony in light of the sources described in testimony and upon which they relied.

Furthermore, a Confrontation Clause violation is subject to harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). A Confrontation Clause violation is harmless, and does not justify habeas relief, unless it had substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir. 2011). Here, the Court of Appeal concluded that, even if a confrontation violation occurred, it was harmless beyond a reasonable doubt "because other witnesses testified, without objection, that [Chavez] admitted engaging in similar conduct." *Chavez*, 2016 WL 594006, at *10. This conclusion was both reasonable and fully supported by the record.

For these reasons, the Court does not find unreasonable or contrary to clearly established federal law the state courts' conclusion that the prosecution's expert testimony did not violate Chavez's rights under the Confrontation Clause. Accordingly, Chavez is not entitled to federal habeas relief on this ground.

C.    Cumulative Error (Ground 4)

Finally, Chavez claims that the cumulative effect of the errors committed in his case warrants habeas relief. The Ninth Circuit has stated "[t]he Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir.

2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)); *see also Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000). "Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still prejudiced a defendant." *Jackson v. Brown*, 513 F.3d 1057, 1085 (9th Cir. 2008) (quoting *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)). Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers*, 401 U.S. at 298, 302-03). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted). In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process. *See Chambers*, 401 U.S. at 294.

Here, the Court of Appeal rejected Chavez's cumulative error claim as follows:

> We have concluded that the only potential error was the failure to give a heat of passion instruction, and that any such error was harmless under any standard. There are no additional errors to cumulate with that error.

*Chavez*, 2016 WL 5940068, at *21.

Under Ninth Circuit precedent, "[t]here can be no cumulative error when a defendant fails to identify more than one error." *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012) (citing *United States v. Laurienti*, 611 F.3d 530, 551 (9th Cir. 2010). In addressing this claim, the Court of Appeal identified only one potential error—the failure to give a heat of passion instruction—and thus determined that cumulation was not possible. A review of the Court of Appeal decision, however, reveals that the appellate court addressed two potential errors. In addition to determining that any error in failing to give a heat of passion was harmless, the Court of Appeal specifically concluded that "any error in allowing the prosecution's experts to relate case-specific testimonial hearsay in explaining the basis of their opinions was harmless beyond a reasonable doubt." *Chavez*, 2016 WL 5940068, at *8. Given that, as discussed more thoroughly above, the failure to give an instruction on a lesser-included offense is not cognizable on federal habeas review, and federal law mandates that the introduction of otherwise inadmissible evidence in support of the testimony of a gang expert witness does not violate the Confrontation Clause, Chavez does not demonstrate federal constitutional errors that would establish prejudice in the aggregate. *See, e.g.*, *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible."). Chavez is therefore not entitled to relief on this claim.

## V. CONCLUSION AND ORDER

Chavez is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court grants a Certificate of Appealability solely with respect to Chavez's cumulative error claim (Ground 4). *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is directed to enter judgment accordingly.

Dated: February 15, 2019.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge
